**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| W.B.H., by and through RYAN HARRINGTON and ASHLEY HARRINGTON, his Parents and Next Friends, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| | _____ |
| THE BOARD OF TRUSTEES OF THE GEORGIA MILITARY COLLEGE, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

COMES NOW W.B.H., by and through Ryan Harrington and Ashley Harrington, his Parents and Next Friends, and brings this action pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42. U.S.C. § 1983 against Defendant The Board of Trustees of The Georgia Military College, and respectfully showing the Court the following:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is subject to the court's personal jurisdiction with respect to this action, and the events underlying this action, occurred in this judicial district.

**PARTIES**

3.

Plaintiff W.B.H. (hereinafter, "Plaintiff" or "Cadet") is a citizen of the United States and a resident of Georgia.

4.

At all times relevant to this lawsuit Cadet had and continues to have a disability within the meaning of both the Americans with Disabilities Act (hereinafter, "ADA") and Section 504 of the Rehabilitation Act (hereinafter, "Section 504").

5.

Defendant The Board of Trustees of The Georgia Military College oversees Georgia Military College Preparatory School (hereinafter, collectively, "Defendant" or "GMC Prep"), a public educational entity created and recognized under the laws of the State of Georgia. *Bd. of Trustees of Ga. Military Coll. v. O'Donnell*, 835 S.E.2d 688, 692 (Ga. Ct. App. 2019) (quoting *Ga. Military College v. Santamorena*, 237 Ga. App. 58, 59 (1) (1999)); *see also* O.C.G.A. § 20-3-541.

6.

Defendant may be served with process upon a chief executive officer or clerk thereof pursuant to O.C.G.A.§ 9-11-4(e)(5). Defendant may also be served with process pursuant to the Federal Rules of Civil Procedure Rule 4(j)(2) by delivering a copy of the Summons and of the Complaint to its chief executive officer. Mr. Randall A. New is Chairman of The Board of Trustees for The Georgia Military College, and service may be made upon him.

7.

Defendant is a public entity providing public services within the meaning of the Americans with Disabilities Act and the Rehabilitation Act.

**STATEMENT OF FACTS**

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 7, as if the same were set forth herein.

9.

Unlike its associated institution Georgia Military College, a liberal arts junior college, GMC Prep offers primary and secondary education for grades 3-12.

10.

Cadet began his matriculation in sixth grade, which was the earliest grade then offered at GMC Prep.

11.

Moreover, GMC Prep has the reputation of offering outstanding educational opportunities to its students.  GMC Prep prides itself on its notable alumni, academic programs, and a 100% graduation rate in each of the last ten academic years, with 97% of students enrolling in post-secondary educational programs.  Moreover, Cadet is a member of a family with a proud tradition of producing graduates of GMC Prep.

12.

GMC Prep is a large public educational institution with substantial resources at its disposal to assist students.

13.

While GMC Prep generally charges tuition when students enroll, it receives financial assistance from the State of Georgia and the United States.

14.

Baldwin County High School is the only other public high school generally available to residents of Baldwin County, but it does not provide equivalent educational opportunities as those offered by GMC Prep.

15.

Baldwin County High School has a School Wide rating of "F" by the Governor's Office of Student Achievement. Additionally, U.S. News ranks Baldwin County High School from 317-416th place of Georgia high schools. Baldwin County High School has a graduation rate of 89%, a reading proficiency rate of 24%, a mathematics proficiency rate of 11%, and of the 12% of students whom took at least one Advanced Placement exam, less than half passed with the minimum score of 3 of 5.

16.

By GMC Prep's account, Cadet was an above-average student academically. Cadet participated in numerous extracurricular activities, where he excelled and even garnered the attention of numerous college programs due to his performance.  Cadet was elected by his classmates to serve as class president in his Sophomore and Junior years of high school.

17.

In sixth grade, eleven-year-old Cadet's teachers noticed that he was struggling in certain areas, and they recommended to his parents that he undergo a psychological evaluation.

18.

Specifically, it was noted that Cadet had trouble focusing and often had a bad temper, exhibiting explosive behavior.

19.

Cadet's parents followed the teachers' recommendation, and on March 17, 2014, Cadet was given an exhaustive Psychological Evaluation by Michael Johns, Psy.D.

20.

Dr. Johns determined from this evaluation that Cadet was above average intelligence but that he also had Attention Deficit Hyperactivity Disorder (herein, "ADHD") and Oppositional Defiant Disorder (hereinafter, "ODD").

21.

Specifically, Dr. Johns stated in the evaluation that Cadet:

[D]isplays symptoms of a predominately hyperactive and impulsive type of ADHD. There is considerable evidence of problems with attention and related skills (e.g. all executive functions), but he showed none of this on direct testing. This is likely because attention tests tend to be fairly simple and because of [Cadet's] intellectual skills he was able to manage. However, he is less able to do so on a day to day basis at school and it is most likely that any academic struggles are the manifestation of weaknesses in behavior and impulse control, attention and concentration, and ultimately motivation which is also often impaired win individuals who have ADHD. Further, the negative impact of ADHD on management of behavior and emotions is evident to parents and teacher on a daily basis, so while his attentional challenges may appear mild at times the severity of other issues is moderate to severe.

(Psych. Eval., Doc. 1-1 at 7.)

22.

Additionally, Dr. Johns stated in the evaluation that Cadet:

[D]isplays a pattern of learned oppositionality (Oppositional Defiant Disorder or ODD) in which he uses behavior to get what he wants or to get out of what he does not want to do. Children with strong-willed temperaments from birth often develop

such behavioral patterns, and it is also a commonly associated condition with ADHD. In [Cadet's] case, his intellectual skills may also aggravate the situation in that he may deem himself smarter than others including adults or he may try to undermine and strategize to subvert disciplinary efforts. Other associated features include irritability, aggression, and defiance or refusal to comply with parental demands. If left untreated, ODD can worsen over time and develop into more engrained and intense problems, making it important.

(*Id.* at 8.)

23.

ADHD is a mental impairment that substantially limits an individual's major life activities.

24.

Individuals with ADHD, like Cadet, often exhibit symptoms of hyperactivity and impulsiveness.  These individuals also struggle maintaining their attention, along with related skills where attention is required.  These symptoms often cause individuals to struggle performing tasks in their daily life, especially at work and in school.  This is true even for intellectually-gifted individuals with ADHD.

25.

Individuals diagnosed with ODD, such as Cadet, exhibit oppositionality that is, behaviors to get what they want or to get out of what they do not want to do.

26.

Dr. Johns noted that this condition is closely associated with ADHD.  Cadet's ODD was exacerbated due to his intellectual skills because it causes him to believe that he is smarter than others.  ODD often results in irritability, aggression, defiance, and refusal to comply with authority figures' demands.  As a result, ODD affects a person's behaviors and can lead to difficulties in school, including disciplinary challenges. (*Id.*)

27.

In his evaluation of Cadet, the psychologist specifically and explicitly recommended that Cadet needed to receive an accommodation plan at school to help manage his disorders. (*Id*. at 8-9.)

28.

The evaluation then provided eleven suggested accommodations that could assist Cadet, and even went so far as to provide specific examples of how these accommodations could be implemented by GMC Prep. (*Id.*)

29.

Cadet's parents provided the report of the psychological evaluation, which GMC Prep marked as being received on May 1, 2014. (*Id.* at 1.)

30.

On September 11, 2014, Cadet, his mother, and five school officials: LTC Giles, MAJ Barsby, LTC Seagraves, MAJ McDonald, and MAJ Blair participated in the first planned annual Section 504 conference with the purpose of addressing Cadet's academic process and explicitly to address whether there was an issue under Section 504 of the Rehabilitation Act that needed to be addressed.

31.

The 504 Team observed that some of Cadet's deficiencies in his academic performance and discipline were directly connected to his ADHD and ODD diagnoses.

32.

During the Section 504 conference, the overall recommendation and findings was that, while Cadet "is eligible for Section 504, he does not require accommodations at this time." LTC Giles was supposed to continue to monitor Cadet's progress.

33.

This recommendation, of course, was at odds with the recommendation from Dr. Johns that Cadet receive accommodations at school.

34.

The notes from the Section 504 meeting mention that Cadet was required to sit by himself due to his disabilities.

35.

On September 2, 2015, Cadet, both of his parents, and five school officials participated in the second annual Section 504 conference.

36.

During this meeting, the school again recognized that Cadet qualified for eligibility under Section 504.

37.

Once again, the team observed behaviors and deficiencies in Cadet's academic performance and discipline that were connected with his ADHD and ODD diagnoses.

38.

Again, the overall recommendation was to not provide an accommodation but to continue to monitor his progress.

39.

An annual Section 504 meeting did not take place in 2016.

40.

An annual Section 504 meeting did not take place in 2017,

41.

An annual Section 504 meeting did not take place in 2018

42.

An annual Section 504 meeting did not take place in 2019.

43.

As of the date of filing, an annual Section 504 meeting has not been held in 2020.

44.

There is nothing in Cadet's file pertaining to Section 504 or accommodations for his eighth and ninth grade academic years.

45.

In a response to a request for all Section 504 documents for Cadet, GMC Prep produced a 35-page record and confirmed that these were *all* records related to the request.  Other than the aforementioned psychological evaluation, documents related to the 2014 and 2015 Section 504 Team conferences, and a few emails between Cadet's parents and GMC Prep staff, GMC Prep only produced four pages of documents related to Section 504.  Specifically, this includes GMC Prep's 10th, 11th, and 12th Grade "504/Monitor List." (Doc. 1-2.)

46.

On November 15, 2018, Cadet's parents received an email notice from the school noting that Cadet needed at least a 70 yearly average to receive credit for a course and that Cadet's grades were below an average of 72.

47.

On January 7, 2019, Cadet's parents received another email notice from the school noting that Cadet needed at least a 70 yearly average to receive credit for a course and that Cadet's grades were below an average of 72.

48.

On March 22, 2019, Cadet's parents again received an email notice from the school noting that Cadet needed at least a 70 yearly average to receive credit for a course and that Cadet's grades were below an average of 72.

49.

All of Cadet's teachers and their supervisors were aware of Cadet's disabilities. (*Id.*)

50.

All of Cadet's teachers and their supervisors were aware of Cadet's academic struggles due to his disabilities.

51.

All of Cadet's teachers and their supervisors were aware of Cadet's behavioral struggles due to his disabilities.

52.

All of Cadet's teachers and their supervisors were aware that a licensed psychologist had stated in a mental health evaluation that Cadet needed to receive certain accommodations. (Doc. 1-1 at 8-9.)

53.

All of Cadet's teachers and their supervisors were aware that they were supposed to hold annual Section 504 meetings for Cadet in order to monitor his process.

54.

All of the teachers, staff, administrators, and officers of GMC Prep whom were tasked with Cadet's education were aware of his disabilities and need for accommodation and had the authority to address and correct the failure to give Cadet an appropriate accommodation.

55.

Despite being aware of Cadet's disabilities, his medically-diagnosed need for accommodations and need to conduct annual reviews to re-evaluate his needs, GMC Prep and its officials failed to provide any accommodations for Cadet and even failed for four consecutive years to monitor whether they believed he needed accommodations.

56.

This total failure to provide an accommodation or even to consider whether accommodations were necessary is unreasonable in light of Cadet's medical diagnosis and his academic struggles. This failure to act constitutes deliberate indifference.

57.

In Summer 2018, Cadet's family experienced a major tragedy when Cadet's great-grandfather committed suicide. Unfortunately, Cadet and his father were the first to arrive after he had been discovered.

58.

This and other difficult circumstances in Cadet's life caused him to experience symptoms of depression and aggravated his disorders. Specifically, the depression caused Cadet to be suicidal at times and to struggle to maintain his academic performance and discipline during the remainder of his Junior year.

59.

GMC Prep was aware of Cadet's depression and the medication that he was prescribed to treat it, especially due to Cadet's close relationship with the school's guidance counselor.

60.

GMC Prep commonly uses a disciplinary tool called the "Bullring," in which students are required to engage in group marching activities.

61.

On April 26, 2019, Cadet was subjected to the "Bullring" due to the length of his hair cut and other minor infractions.

62.

During that session, Cadet turned around to tell a classmate to stop talking because it was not permitted during Bullring. An instructor observed Cadet at the moment that he was turned in the wrong direction and chastised him for his behavior.

63.

Later, during the same session, Cadet turned around to ask a fellow cadet to "call cadence" to aid in marching.  Again, unfortunately, the instructor observed Cadet turned around, but he did not hear what Cadet said. Because this was the second infraction during this bullring session, the instructor advised Cadet that he was dismissed and would not receive credit for attending the Bullring.

64.

Being dismissed without credit meant that Cadet would not be eligible to participate in the school play later that same evening. Participation in the theater production was one of Cadet's primary interests.  Knowing he would be unable to perform, Cadet got upset and verbally objected to the instructor's action.  Specifically, he felt like he was being intentionally harassed and humiliated without cause by the instructor, and he responded "[y]ou can't f***ing do this [to me]."

65.

Three days later, Cadet's parents met with GMC Prep administrators who told Cadet's that they had to "voluntarily" and temporarily withdraw Cadet with an opportunity for him to be readmitted in the Fall in order to avoid his suspension from GMC Prep.

66.

While Cadet's parents agreed to the withdrawal, they were never asked to submit any documentation showing the withdrawal; as a result, Cadet legally remained a student at GMC Prep.

67.

This "withdrawal" was understood to be temporary, with Cadet returning to GMC Prep at the start of the Fall 2019 semester, on the condition that Cadet 1) receive a letter from a mental health professional indicating that he was not a threat to himself or others; 2) pass a required

summer school to keep on track for his senior year; and 3) enter into a Probationary Discipline Contract.

68.

Cadet completed all the requirements set forth by GMC Prep to permit his return.

69.

The "Probationary Discipline Contract" provided for re-enrollment under disciplinary probation until his graduation on May 29, 2020.

70.

This Probationary Discipline Contract included the following pertinent provisions:

- "if he commits a Class II offense. He will be expelled without the opportunity to withdraw;"

- "should [Cadet] fail to meet any Retraining obligations as may be assigned, and subsequently suspended for reaching 8 or more hours, his suspension will result in immediate withdrawal from GMC Prep School;" and,

- "[Cadet's] failure to participate in and/or failure to comply with the terms of this probationary contract for any reason, will automatically result in admission denial/recommended expulsion from CMG Prep School."

71.

The Probationary Discipline Contract then goes on to recite and explain the different "Classes" of "Virtue Deficiencies" that are apparently described in the GMC Prep School Student Handbook.

72.

None of the Virtue Deficiencies described in the Probationary Discipline Contract apply to alleged acts occurring outside of the school and school activities.

73.

The Probationary Discipline Contract includes a final catchall clause:

Other Offenses: these offenses include any violation of the Student Handbook, gambling, participation in gang-related activities or dress, violating drug & alcohol policies, an offense that discredits the Corps of Cadets, and other major disciplinary violations not listed above.

74.

The GMC Prep School Student Handbook describes additional specific "Virtue Deficiencies" including: Virtue Deficiencies: 4. Honor: "Conviction under state criminal law."

75.

On August 14, 2019, Cadet had an altercation with his father that resulted in a neighbor calling law enforcement.

76.

While the authorities detained Cadet, he was ultimately released and prosecutors chose to "dead docket" the charges and dismiss the case.

77.

The alleged incident occurred at Cadet's home and did not involve any other GMC Prep students, faculty, or staff.

78.

However, apparently someone forwarded the incomplete facts of the incident to GMC Prep administrators.

79.

On or about August 18, 2019, COL Pam Grant (Principal), Dr. Steve Greer (Vice Principal), and Ms. Jenniee Zipperer (Director of Staff) met with Cadet's parents and attempted to force them under duress to withdraw Cadet on the basis that the August 14, 2019, incident constituted a violation of the Probationary Discipline Contract.

80.

The GMC Prep officials never provided an explanation of how the act constituted a violation of the Probationary Discipline Contract; in fact, no reference was ever made to the Contract.

81.

The GMC Prep officials stated at the August 19, 2019, meeting that Cadet would be considered for readmission 90 days from that date.

82.

Again, no withdrawal paperwork was completed, and Cadet legally remained a student at GMC Prep.  However, on August 22, 2019, COL Grant wrote to Cadet's parents to inform them that Cadet had been withdrawn.  Upon his receipt of this correspondence, Cadet's father immediately called COL Grant in an attempt to reverse this decision.  COL Grant refused to take action and told Cadet's father that it was up to Gen. Caldwell, who is the President of Georgia Military College.

83.

Cadet's father spoke the Gen. Caldwell on September 4, 2019, but Gen. Caldwell refused to consider reversing the decision to remove Cadet.

84.

On September 11, 2019, COL Grant emailed Cadet's parents notifying them that they had until December 10, 2019, to provide documentation for Cadet to be considered for readmittance.

85.

On October 15, 2019, GMC Prep sent Cadet's parents an email stating that "a Section 504 plan with accommodations was never developed" for Cadet, despite his known academic and personal struggles due to his disability.

86.

On October 18, 2019, in response to Cadet's parents' emails, COL Grant told Cadet's parents that if they submitted the documents before December 2, 2019, then they would hold a hearing on December 6, 2019.

87.

On October 22, 2019, Ms. Zipperer reaffirmed the December 2 and 6, 2019 deadlines. However, this correspondence was the first time that a new "psychological evaluation" was mentioned as a requirement for submission with his application for readmission. (Doc. 1-3 at 4.)

88.

On October 23, 2019, Cadet's mother wrote back to Ms. Zipperer and requested clarification as to what type of "psychological evaluation" was required as there are many different types of evaluations. Cadet's mother also noted that it was necessary to know exactly what type of evaluation was required as most cost several thousand dollars. Finally, she noted that this was the first time this new requirement had been mentioned and that the soonest they would be able to get any kind of evaluation would be two months based on the availability of licensed professionals.

Thus, the earliest that they could obtain the newly required paperwork would fall approximately two weeks after the December deadline. (*Id.* at 3.)

89.

On October 23, 2019, Ms. Zipperer responded without clarifying the type of evaluation required and stated that it might be possible to schedule a meeting "in the next few weeks" to go over what the school would need to determine whether to re-enroll Cadet. (*Id.* at 1-2.)

90.

On October 25, 2019, Cadet's parents wrote again stating that they would be more than willing to meet, noted that the requirements for readmission appeared to be changing, and again stated that an evaluation would not be possible for two months.  They also offered to present a statement from Cadet's current therapist in lieu of a the undefined psychological evaluation. (*Id.* at 1.)

91.

In a series of emails exchanged on October 28 and 29, 2019, Cadet's parents scheduled a meeting with Gen. Caldwell on October 30, 2019 at 3:30 PM, which they had requested since COL Grant identified Gen. Caldwell as the decision maker.

92.

Unfortunately, late on October 29, 2019, Cadet's parents were informed that General Caldwell would not be attending and that the meeting was *only* to provide them with further notice of what was needed to determine whether to readmit Cadet.

93.

Because the meeting was solely to clarify what the necessary documents were and because Gen. Caldwell would not be attending the meeting, Cadet's parents believed that the meeting would be of little purpose and stated that they did not plan to attend.

94.

On October 30, 2019, GMC Prep, for the first time, indicated that they would conduct a "panel" on November 8, 2019, instead of reviewing documents submitted by early December 2019.

95.

GMC Prep now required that Cadet's parents submit all supporting documentation by November 7, 2019, despite still having not specified the type of psychological evaluation that they were now purportedly requiring.

96.

On November 8, 2019, unidentified GMC Prep officials apparently met, reviewed some unknown documents, and voted to deny Cadet's readmission by "secret ballot." (*See* Doc. 1-4.)

97.

Neither Cadet nor his parents were invited to this hearing or even given notice that it would take place.

98.

Cadet and his family were not provided with a specific reason for his disenrollment or what the panel was considering to permit his readmission.

99.

The Principal adopted the panel's recommendation, which was affirmed by the President. (*Id.*)

100.

The Principal expressly stated that this decision was "final" and that Cadet was not provided with any opportunity to appeal the decision – despite the repeated requests of his parents. (*Id.*)

101.

Of course, Cadet still remained a student at GMC Prep as he had never been formally withdrawn. Thus, the hearing was not actually a hearing on Cadet's "readmission," but was a hearing on his expulsion.

102.

In making its decision, the GMC Prep panel purportedly considered: (1) the documents that the Cadet's parents had been able to submit thus far; (2) Cadet's academic record; and (3) Cadet's conduct subsequent to the April 2019 withdraw. (*Id.*)

103.

Notably absent from GMC Prep's decision was Cadet's disabilities, that GMC Prep recognized fell under Section 504, and the possibility of the need for an accommodation. (*See id.*)

104.

These disabilities were the foundation of Cadet's alleged academic and disciplinary deficiencies, and as a result, GMC Prep denied Cadet's return due to his disabilities.

105.

On January 3, 2020, Cadet's parents, through counsel, demanded that Cadet be permitted to return to school when his final semester of secondary education began the next week.

106.

Critically, this letter explained that Cadet's alleged behaviors were directly connected to his well-documented mental health and behavioral challenges and that Cadet's involuntary removal from this public institution was in violation of Section 504.

107.

On January 13, 2020, GMC Prep, through the Attorney General's office, advised counsel for Cadet that he would not be permitted to return and erroneously stated that the withdrawal was voluntary.

**COUNT I:**
**VIOLATION OF TITLE II OF THE**
**AMERICANS WITH DISABILITIES ACT**

108.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 107, as if the same were set forth herein.

109.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

110.

To state a claim under Title II of the ADA, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

111.

Defendant is considered a public entity under Title II of the Americans with Disabilities Act. 42 U.S.C. § 12131.

112.

As alleged herein, Plaintiff is properly considered a person with a disability under the ADA as he has ADHD and ODD, impairments that substantially limit several major life activities and that result in a substantial impediment.

113.

Plaintiff was diagnosed with ADHD and ODD, his symptoms are severe as outlined in the 2014 psychological evaluation, and his psychological evaluator recommended that Plaintiff receive accommodations to assist him with coping with his disorders.

114.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities. Specifically, Plaintiff has ADHD, which causes trouble with weaknesses in behavior, impulse control, attention and concentration, motivation, schoolwork in general, and management of

behavior and emotions.  ADHD substantially limits several major life activities for Plaintiff, including his ability to concentrate, complete schoolwork, manage his emotions, and interact with others in certain situations.

115.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities. Specifically, Plaintiff has ODD, which causes irritability, defiance, and refusal to comply with parental demands.  ODD substantially limits several major life activities for Plaintiff, including his ability to concentrate, complete schoolwork, manage his emotions, and interacts with others in certain situations.

116.

Plaintiff was perceived as having a disability by Defendant, as evidenced by their possession of a psychological evaluation noting both his ADHD and his ODD as early as 2014, his continued presence on the Section 504 student list, and Defendant's admission in the 2014 Section 504 meeting notes that Plaintiff was eligible under Section 504.

117.

The 2014 psychological evaluation stated that Plaintiff needed an accommodation for his disabilities. The evaluation even provided examples of accommodations that would assist Plaintiff.

118.

The accommodations requested were available, would have been effective, and would not have posed an undue hardship on Defendant.

119.

Defendant failed and refused to provide any accommodations to Plaintiff and the record is completely devoid of GMC Prep considering alternative or evaluating the reasonableness of any alternatives proposed in the psychological evaluation.

120.

Additionally, Defendant entirely failed to continue to conduct annual Section 504 reviews despite the fact that ADHD and ODD have the potential, as noted in the 2014 psychological evaluation, to worsen over time creating an increasing likelihood of the need for accommodation.

121.

Defendants discriminated again Plaintiff by:

a. Requiring Plaintiff to sit by himself;

b. Refusing to provide Plaintiff with academic accommodations;

c. Refusing to provide Plaintiff with disciplinary accommodations;

d. Forcing Plaintiff to withdraw in the Spring 2019 based on a symptom of his ODD triggered by school officials intentionally using ineffective disciplinary techniques that they knew or should have known would result in "misbehavior;"

e. Forcing Plaintiff to withdraw in Fall 2019 on unsubstantiated rumors based on their predisposed bias against Plaintiff due to his disabilities; and

f. Refusing to readmit/expelling Plaintiff after having considered factors that would have been prevented had an accommodation been provided and failing to consider Plaintiff's disability.

122.

As noted in the 2014 Section 504 meeting notes, Defendant intentionally made Plaintiff sit by himself, thereby isolating him and discriminating against him needlessly based on his disability.

123.

As a result of not being provided with the requested accommodation, Plaintiff struggled in his schoolwork and did not receive the appropriate educational mentoring he needed.

124.

Plaintiff's disability made the effectiveness of "Bullring" exercises minimal and only exacerbated the symptoms of Plaintiff's disabilities.

125.

Despite being aware that the "Bullring" discipline would have a negative impact on Plaintiff and would likely trigger the manifestations of ODD, Defendant still subjected Plaintiff to the "Bullring" discipline.

126.

There are many other forms of discipline that Defendant could have used that would not have negatively impacted Plaintiff and that would have likely prevented the April 26, 2019, incident.

127.

The failure to provide Plaintiff with any accommodation resulted in the academic and disciplinary circumstances that resulted in Defendant involuntarily removing Plaintiff from school.

128.

Had Defendant provided Plaintiff with a reasonable accommodation for his disabilities, Plaintiff's academic and disciplinary performance likely would have improved.

129.

Defendant was aware of Plaintiff's disability, his need for an immediate accommodation as medically directed, his need to be monitored annually to determine his need for accommodation, and his being forced to sit by himself, among other acts of discrimination.

130.

GMC Prep's president, principal, chief of staff, and all of Plaintiff's teachers were appropriate persons with the authority to correct any and all discrimination against Plaintiff.

131.

Despite this knowledge of discrimination and having the authority to correct any and all discrimination, no action was taken to rectify the problem. Thus, Defendant acted with deliberate indifference in its discrimination of Plaintiff.

132.

Title II of the Americans With Disabilities Act creates a private cause of action against Defendant, and Defendant is not entitled to sovereign immunity. *United States v. Georgia*, 546 U.S. 151, 158-89 (2006).

133.

As alleged herein, Defendant's actions, including the failure to provide a reasonable accommodation, amount to intentional discrimination of Plaintiff, as a direct result of his ADHD and ODD, in violation of Title II of the Americans with Disabilities Act.

134.

Plaintiff has been injured by Defendant's discrimination due to its failure to provide an accommodation, and Plaintiff is entitled to all damages allowed under the Americans with

Disabilities Act, including injunctive relief, compensatory and punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT II:
## VIOLATION OF SECTION 504
## OF THE REHABILITATION ACT

### 135.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 107, as if the same were set forth herein.

### 136.

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States, … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

### 137.

To state a claim under Section 504 of the Rehabilitation Act, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

### 138.

"Discrimination claims under the ADA and Rehabilitation act are governed by the same standards, and the two claims are generally discussed together."  *J.S., III by nu and through J.S.,*

*Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017) (citing *Cash v. Smith*, 231

F.3d 1301, 1305 (11th Cir. 2000).

139.

For the reasons set forth in Count I (*supra* at ¶¶ 111-33), which is incorporated herein,

Defendant has discriminated against Plaintiff based on his disability, including Defendant's failure

to provide a reasonable accommodation, in violation of Section 504 of the Rehabilitation Act of

1973.

140.

Defendant should have been aware that the alleged conduct may have been connected to

Plaintiff's disabilities.

141.

Accordingly, Defendant failed to make the appropriate manifestation determination prior

to permanently removing Plaintiff's enrollment in violation of Section 504.  34 C.F.R. § 104.35.

142.

Plaintiff is entitled to all damages available by law for violation of his rights under Section

504 of the Rehabilitation Act of 1973 in an amount to be proven at trial.

**COUNT III:**
**VIOLATION OF DUE PROCESS RIGHTS**
**PURSUANT TO SECTION 1983**

143.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in

Paragraphs 1 through 107, as if the same were set forth herein.

144.

The Fourteenth Amendment to the Constitution of the United States of America guarantees that no government will "deprive any person of life, liberty, or property, without due process of law."

145.

Defendant is a public education entity/institution of the State of Georgia.

146.

Plaintiff has a right to a public education,

147.

Plaintiff is an unemancipated minor who is older than the age of mandatory attendance, but neither has the intent or written permission of his parents to withdraw, and mandated to attend school pursuant to O.C.G.A. § 20-2-690.1.

148.

Plaintiff also has the right to be free from arbitrary and capricious intrusions on his right to a public education.

149.

Defendant forced Plaintiff to withdraw in April 2019 without providing Plaintiff with notice or hearing.

150.

After allowing Plaintiff to return on probation, Defendant forced Plaintiff to withdraw in August 2019 due to his alleged breach of the Probationary Discipline Contract without providing Plaintiff with notice or hearing.

151.

Defendant may not withdraw the right to education on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct occurred.

152.

Plaintiff was arbitrarily deprived of his due process rights when he was not given the minimum requirement of notice and opportunity for hearing to contest whether the alleged misconduct had occurred and whether Plaintiff breached the Probationary Discipline Contract.

153.

Defendant failed to provide Plaintiff with the additional rights to fair and deliberate decision making to which he is entitled under Section 504 of the Rehabilitation Act.

154.

Defendant failed to provide Plaintiff with any procedural due process when Defendant decided in November 2019 not to allow Plaintiff to return to school.

155.

As a result of Defendant's intrusion into the due process rights of Plaintiff as guaranteed by the Fourteenth Amendment to the United States Constitution, Plaintiff is entitled to all damages allowable by law in an amount to be proven at trial pursuant to 42 U.S.C. §1983.

**COUNT IV:**
**VIOLATION OF DUE PROCESS**
**PURSUANT TO THE GEORGIA CONSTITUTION**

156.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 107, as if the same were set forth herein.

157.

Defendant is a public education entity.

158.

The Georgia Constitution Article I, § 1, Paragraph 1 provides that, "No person shall be deprived of life, liberty, or property except by due process of law."

159.

The due process clause of the Georgia Constitution, while mirroring the language of the due process clause of the Fourteenth Amendment, affords greater protection than does federal due process. *Fields v. Rockdale County, Georgia,* 785 F.2d 1558, 1561 (11th Cir. 1986), *cert. denied,* 479 U.S. 984. (citing *Barrett v. Hamby,* 235 Ga. 262 (1975)).

160.

The higher due process standard imposed by the due process clause of the Georgia Constitution requires that a defendant present "sufficient justification" for its decisions. *Barrett,* 235 Ga. at 266.

161.

For the reasons set forth in Count III (*supra* at ¶¶ 145-54.), which are incorporated herein, Defendant has violated Plaintiff's right to due process as guaranteed by the Constitution of the State of Georgia, and Plaintiff is entitled to all damages available by law in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## REQUEST FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests that the Court issue notice to Defendant, set a hearing on Plaintiff's forthcoming Motion for Preliminary Injunction, and issue an order enjoining Defendant's further violation of Plaintiff's rights as set forth herein, up to an including, requiring Defendant to immediately reinstate Plaintiff's enrollment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff W.B.H., by and through Ryan Harrington and Ashley Harrington, his Parents and Next Friends, respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant and that Defendant be served as provided by law;

2)      That this matter be tried before a Jury on all issues so triable;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for violation of Title II of the Americans with Disabilities Act, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for Violation of Section 504 of the Rehabilitation Act, and grant Plaintiff all relief allowable under the Rehabilitation Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for violation of Plaintiffs due process rights as set forth under the Fourteenth Amendment to the United States Constitution pursuant to Section 1983;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IV for violation of Plaintiff's due process rights under the Georgia Constitution; and,

7)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 3rd day of February, 2020.


KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile